UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| |
|---|
| COMMONWEALTH OF MASSACHUSETTS, |
| Plaintiff, |
| v. |
| DYNAMIC ENERGY SOLUTIONS, LLC, |
| Defendant. |

Case No.

**COMPLAINT**

## INTRODUCTION

1.    Defendant Dynamic Energy Solutions, LLC ("Dynamic"), a solar energy development company, is violating federal and state water protection laws at its solar array development at 103 Briar Hill Road, Williamsburg, Massachusetts (the "Array" or the "Site") and in the area of an access road to the Array located in the Towns of Williamsburg and Goshen ("Access Road"). Dynamic constructed the 18.5-acre Array up-gradient of the West Branch Mill River in Williamsburg without designing or implementing legally-required stormwater controls. As a result, Dynamic caused sediment-laden stormwater to be discharged in extreme amounts from the Site, eroding the hillside, scouring out perennial and intermittent streams, uprooting trees, destroying streambeds, filling in wetlands with sediment, and causing the River to become brown and turbid. Dynamic's violations have adversely impacted the West Branch Mill River, its tributaries including Rogers Brook, and associated wetlands.

2.      The United States Environmental Protection Agency ("EPA") has identified sediment pollution as the most significant cause of water quality degradation in rivers and streams in the United States. Excessive sediment discharged to waterways destroys habitat, harms aquatic organisms, and can contribute to flooding. The Commonwealth has designated the West Branch Mill River and Rogers Brook as "Coldwater Fish Resources" and, in the area near the Site, as "Core Habitat" essential to ensuring the long-term persistence of species of conservation concern.

3.      The survival of aquatic organisms is threatened by excessive sedimentation. Sediment settles to the bottom of a river where it disrupts and smothers bottom feeding organisms. Sediment becomes suspended in water, where it harms and kills fish by clogging their gills, making it harder for them to breathe. Excessive sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend. For example, sediment in the water column increases turbidity, reducing light penetration, decreasing the ability of plant communities to photosynthesize, preventing animals from seeing food, and reducing fish populations. In addition, certain chemical pollutants, including toxic pollutants such as heavy metals, pesticides, and petroleum by-products, bind to sediment and are picked up by rainwater and snow-melt (jointly, "stormwater") as it washes across the land during events. Stormwater contaminated with these pollutants can significantly impact water quality when it is discharged to rivers and other waterbodies. Sediment can also alter the flow of water in a river and reduce the river's depth, contributing to flooding.

4.      Dynamic's activities result in excessive sediment discharges to the West Branch Mill River and Rogers Brook, and their associated tributaries and resource areas. Dynamic's sediment discharges are not authorized by any permit and violate federal and state environmental laws.

5.      The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the federal Clean Water Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"), the Massachusetts Wetlands Protection Act, G.L. c. 131, § 40, and the Massachusetts Clean Waters Act, G.L. c. 21, §§ 26-53. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress Dynamic's illegal discharges of pollution to the West Branch Mill River, Rogers Brook, and their associated tributaries and resource areas.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States) and 28 U.S.C. § 1367 (supplemental jurisdiction over related state claims).

7.      On May 17, 2019, plaintiff provided notice of Dynamic's violations of the federal Clean Water Act, and of its intention to file suit against Dynamic (the "Notice Letter"), to EPA; the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Dynamic, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

8.      More than sixty days have passed since notice was served.

9.      This action is not barred by any prior state or federal action to enforce the violations alleged in this complaint.

10.     The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters, and the related health, safety, economic, recreational, aesthetic and environmental interest those waters provide. The interests of the Commonwealth have been, are

3

being, and will continue to be adversely affected by Dynamic's failure to comply with environmental laws, as alleged herein. The relief sought herein will redress the harms to the Commonwealth caused by Dynamic's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

11.     Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

12.     Plaintiff is the Commonwealth appearing by and through the Attorney General.

13.     The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the relief requested herein under G.L. c. 12, §§ 3 and 11D.

14.     Dynamic is a for-profit corporation organized under the laws of Pennsylvania. Dynamic is based in Wayne, Pennsylvania with several locations throughout the country, including Andover, Massachusetts.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

15.     The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Section 301(a) of the Act, 33 U.S.C. § 1251(a).

16.     The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge follows certain statutory requirements, including the

4

requirement that the discharge be permitted by EPA under the National Pollutant Discharge

Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C.

§§ 1311(a), 1342(a), 1342(p).

17.     Polluted stormwater is the leading cause of water quality impairment in

Massachusetts. Sediments such as sands, clays, and silts are the most common pollutants in

stormwater runoff by volume and weight. Sediment discharge significantly harms Massachusetts

waters, and is the primary cause of river and stream degradation nationwide. Excess sediment

destroys aquatic habitats. It smothers smaller organisms that live on the bottom of rivers, streams

and wetlands, and starves the larger organisms that feed on them. Sediment also causes flooding by

filling up areas that absorb rainwater and by altering riverine flows.

18.     Construction site erosion can be a significant source of sediments in waterways and

wetlands. When vegetation is removed from construction sites, soils are exposed and made more

mobile, allowing erosion to begin. The severity of erosion is influenced by the amount of exposed

soil, soil type, slope, and rainfall. Clearing an entire site and leaving soils exposed until

construction and landscaping is completed greatly increases the potential for erosion. Erosion also

increases on long, steep slopes and on sites with exposed soil.

19.     To address the significant threat to water quality from construction activities, EPA

issued a Construction General Permit under the NPDES program (the "Permit"). The Permit's

conditions are intended to prevent the discharge of sediment-laden stormwater from construction

activities to waters of the United States.

20.     An operator of a construction site that will disturb one or more acres of land

(sometimes referred to herein as "developer") must apply for and begin complying with the Permit

prior to commencing construction activities. EPA issued the current permit in in 2017. The Permit

5

defines "construction activities" to include "earth-disturbing activities, such as the clearing, grading, and excavation of land, and other construction-related activities … that could lead to the generation of pollutants." Appendix A of the Permit, pg. A-2.

21.     Under the Permit, developers must conduct advanced planning to analyze the potential for erosion, sedimentation, and other pollutant discharges from their projects, and to design, install, and maintain stormwater controls to minimize stormwater pollutant discharge during construction. Permit, Part 2.1. The advanced planning requirement is designed to ensure that stormwater controls are fully installed and operational *before* initial site clearing, grading, excavating, and other earth-disturbing activities commence. Permit. Part 2.1.3.

22.     As a first step in the advanced planning process, a developer must prepare a stormwater pollution prevention plan ("SWPPP"). The SWPPP must adequately describe, among other things, the factors relevant to selecting stormwater controls; the stormwater controls selected; the maintenance requirements for stormwater controls; and the developer's procedures for training, inspections, and corrective action. Permit, Part 7.

23.     The SWPPP must include a site map, showing, among other things,

    a.   property boundaries;

    b.   locations where construction activities will occur, including but not limited to:

        i.   locations where earth-disturbing activities will occur (noting any phasing),

        ii.   approximate slopes before and after grading activities;

        iii.   locations where sediment, soil or other construction materials will be stockpiled; and

        iv.   any water of the U.S. crossings;

    c.   type and extent of pre-construction cover on the site;

    d.   drainage patterns of stormwater before and after major grading activities;

    e.   stormwater discharge locations; and

    f.   locations of stormwater controls.

Permit, Part 7.2.4.

24.     The SWPPP must include a description of the construction activities, Permit, Part 7.2.3, and a description of stormwater controls. Permit, Part 7.2.6.

25.     The Permit sets forth certain factors to be included among those considered by developers in designing their stormwater controls. These include:

    a.   the expected amount, frequency, intensity, and duration of precipitation;

    b.   the nature of stormwater runoff and run-on at the site, including factors such as expected flow from impervious surfaces, slopes, and site drainage features; and

    c.   the soil type and range of soil particle sizes expected to be present on the site.

Permit, Part 2.1.1.

26.     Stormwater controls must be designed and installed in accordance with good engineering practices, Permit, Part 2.1.2, and be properly maintained. Permit, Part 2.1.4.

27.     In general, the Permit requires that the following controls should be included in the SWPPP and then implemented by the developer:

    a.   maintain appropriate natural buffers if the site is within 50 feet of a water of the United States (Part 2.2.1);

    b.   direct stormwater to vegetated areas and maximize infiltration and filtering (Part 2.2.2);

    c.   install perimeter sediment controls (Part 2.2.3);

    d.   minimize sediment track-out (Part 2.2.4);

    e.   appropriately manage sediment-laden piles (Part 2.2.5);

    f.   preserve native topsoil unless infeasible (Part 2.2.8);

    g.   minimize soil compaction (Part 2.2.9);

    h.   use erosion controls and velocity dissipation devices to minimize erosion of stormwater conveyance channels and their embankments, outlets, adjacent streambanks, slopes, and downstream waters (Part 2.2.10);

    i.   properly design and maintain impoundments such as sediment basins (Part 2.2.12);

    j.   promptly stabilize exposed portions of the site (Part 2.2.14); and

    k.   establish long-term stabilization measures that will to remain in place after construction activities have ceased.

28. After completing the SWPPP, the developer must submit to EPA a "complete and accurate" Notice of Intent ("NOI") to be covered by the Permit. Part 1.4. It is a prerequisite for submitting an NOI that a SWPPP with the necessary components has already been developed. Permit, Part 1.4.1. According to the Permit, "[d]ischarges are not authorized if your NOI is incomplete or inaccurate…." Permit, pg. 5, n. 8.

29. The Permit specifies that stormwater discharges must be controlled as necessary to meet applicable water quality standards. Permit, Part 3.0.

30. The permit holder must also conduct regular site inspections to make sure all stormwater controls are installed and working properly, Permit, Part 4.6.1, and timely perform maintenance and corrective actions when they are not. Permit, Part 4.6.7. If a discharge is occurring during the inspection, the operator must identify its location and document its visual

quality and characteristics. Permit, Part 4. If the site discharges to "high quality" or "Tier 2.5" waters, the permittee must inspect the sites once every seven (7) calendar days and within 24 hours of the occurrence of a storm event of 0.25 inches or greater, or the occurrence of runoff from snowmelt sufficient to cause a discharge. Permit, Part 4.3. An inspection report must be prepared within 24 hours of completing the inspection, Permit, Part 4.7.

31.     A permit holder must also take corrective action to expeditiously repair or replace stormwater controls when necessary, and to eliminate any excessive stormwater pollution, water quality standard violation, or prohibited discharge, Permit, Part 5.0. When the problem requires a new or replacement control or significant repair, the work must be complete within seven calendar days of the day of discovery. If it is infeasible to complete this work within the seven-calendar day deadline, the permittee must document why that is, and document a schedule for installing stormwater controls and making them operational as soon as feasible thereafter. Permit, Part 5.2.

32.     A permit holder must properly train staff to ensure appropriate personnel understand the requirements of the Permit and their responsibility with respect to those requirements. Permit, Part 6.0.

33.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).

34.     The Commonwealth is a "citizen" within the meaning of Section 505 of the Act, because it is a "person" having an interest which is or may be adversely affected. *See* Section 505(g); 33 U.S.C. § 1365(g).

35.    Under Section 505 of the Clean Water Act, this Court has authority to enjoin Dynamic's violations of the Permit, and to impose penalties of up to $54,833 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. §§ 19.1 - 19.4; 84 Fed. Reg. 2056 (Feb. 6, 2019).

## State Environmental Requirements

*Wetlands Protection Act*

36.    The Wetlands Protection Act, G.L. c. 131, § 40, and its implementing regulations, 310 C.M.R. §§ 10.00 *et seq.* ("Wetlands Regulations"), establish a comprehensive regulatory scheme to prevent damage to certain protected resource areas and to compel restoration of resource areas that are illegally altered or filled.

37.    The Wetlands Protection Act and the Wetlands Regulations limit activities in various defined wetlands resource areas, including Banks (Inland), Bordering Vegetated Wetlands, Land Under Water Bodies and Waterways, and Riverfront Areas (collectively "Resource Areas"). G.L. c. 131 § 40; 310 C.M.R. §§ 10.02, 10.04. Resource Areas serve many important functions, including protecting water quality, reducing flood and storm damage, preventing pollution, and protecting fisheries and wildlife habitat. 310 C.M.R. §§ 10.54(1); 10.55(1); 10.56(1); 10.58(1). Improper alteration of land under rivers can harm fish and other aquatic animals by destroying habitat for the smaller aquatic organisms at the bottom of the food chain and by reducing the circulation of oxygen in the water column. The alteration of Bank (Inland)s, Bordering Vegetated Wetlands, and Riverfront Areas can harm water quality by reducing the filtering of sediments, toxic substances (such as heavy metals), and nutrients (such as phosphorus and nitrogen) from stormwater.

38.     With exceptions not applicable here, any person who plans to perform activities within 100 feet of a Resource Area (within the "Buffer Zone") must either obtain an Order of Conditions or submit a Request for a Determination of Applicability ("RDA") on whether the project is likely to impact Resource Areas and require an Order of Conditions under the Wetlands Protection Act. *Id.* An RDA must be accompanied by specific information to facilitate a correct assessment by the Conservation Commission of the project's potential impacts on Resource Areas. 310 C.M.R. § 10.05(3)(a). Among the information required to be submitted is an accurate description of the proposed work and its precise location relative to the boundaries of each Resource Area and Buffer Zone. *See* WPA Form 1 Instructions, *available at* https://www.mass.gov/how-to/wpa-form-1-request-for-determination-of-applicability. ("Form 1"); s*ee also* 310 C.M.R. § 10.05(3)(a).

39.     RDAs must be certified as complete and accurate by the project proponent. Form 1, pg.; s*ee also* 310 C.M.R. § 10.05(3)(a).

40.     Making any false, inaccurate, or misleading statements in any certification filed under the Wetlands Regulations, including in an RDA, violates the Wetlands Regulations. 310 C.M.R. § 10.08(1)(d).

41.     If the Conservation Commission concludes that the activities described in the RDA will alter a Resource Area, it will issue a Positive Determination of Applicability triggering the need for an NOI and Order of Conditions prior to commencement of work. 310 C.M.R. §§ 10.05(3)(b)(2), 10.02(1)-(2). If the Conservation Commission concludes that the activities described will not alter a Resource Area, it will issue a Negative Determination of Applicability signaling that the activities are not subject to the Wetlands Regulations and that the work may proceed without an Order of Conditions. *See* 310 C.M.R. §§ 10.05(3)(b)(2), 10.02(1)-(2).

11

42.     Failure to comply with a Final Determination by a Conservation Commission, including but not limited to a Negative Determination of Applicability, is a violation of the Wetlands Regulations. 310 C.M.R. § 10.08(1)(a).

43.     It is a violation to fail to restore illegally altered land to its original condition. G.L. c. 131.

44.     MassDEP is authorized to issue enforcement orders to direct compliance with the Wetlands Protection Act. G.L. c. 131, § 40; 310 C.M.R. § 10.08(1)(a). Failure to comply with an enforcement order is a violation of the Wetlands Protection Act and the Wetlands Regulations. G.L. c. 131, § 40; 310 C.M.R. § 10.08(1)(a).

45.     Under G.L. c. 131, § 40, a court may enjoin violations of the Wetlands Protection Act and may enter such orders as it deems necessary to remedy the violations, including orders to restore the altered resource to its original condition.

46.     Pursuant to G.L. c. 131, § 40, any person who violates the Wetlands Protection Act or the Wetlands Regulations shall be subject to a civil penalty of up to $25,000 for each violation, with each day such violation occurs or continues constituting a separate violation.

47.     The Attorney General has authority to enforce the Wetlands Protection Act and the Wetlands Regulations pursuant to state law. *See* G.L. c. 12, §§ 3 and 11D.

*Massachusetts Clean Waters Act*

48.     The Massachusetts Clean Waters Act, G.L. c. 21, §§ 26–53 is intended "to enhance the quality and value of water resources and to establish a program for prevention, control, and abatement of water pollution." G.L. c. 21, § 27.

49.    Pursuant to G.L. c. 21, § 27(12), Mass DEP has adopted rules and regulations to protect the quality and value of water resources in Massachusetts. These regulations are published at 314 C.M.R. §§ 2.00–18.00 (the "CWA Regulations").

50.    The Massachusetts Clean Waters Act and the CWA Regulations provide, with exceptions not relevant here, that no person shall discharge pollutants into waters of the Commonwealth without a state issued pollutant discharge permit. *See* G.L. c. 21, § 43(2); 314 C.M.R. § 3.03.

51.    CWA Regulations prohibit the "discharge of dredged or fill material" to a Water of the United States within the Commonwealth without submission of a 401 Water Quality Certification Application ("Application") to MassDEP, subject to exceptions not applicable here. 314 C.M.R. § 9.02. In addition, no new stormwater outfalls may cause erosion in a Water of the United States within the Commonwealth. 314 C.M.R. § 9.06(6)(a)(1).

52.    CWA Regulations include water quality standards restricting the amounts of "Solids" and "Color and Turbidity" that may be in a waterbody. 314 C.M.R. § 4.05. Pursuant to Massachusetts water quality standards, waters shall be "free from floating, suspended and settleable solids in concentrations and combinations that would impair any use assigned to the [waterbody], that would cause aesthetically objectionable conditions, or that would impair the benthic biota or degrade the chemical composition of the bottom." 314 C.M.R. §§ 4.05(3)(a)(5); 4.05(3)(b)(5); 4.05(3)(c)(5). Waters shall also be "free from color and turbidity in concentrations or combinations that are aesthetically objectionable or would impair any use assigned to the [waterbody]." 314 C.M.R. §§ 4.05(3)(a)(6); 4.05(3)(b)(6); 4.05(3)(c)(6).

53.    G.L. c. 21, § 46 authorizes injunctive relief for violations of G.L. c. 21 and the CWA Regulations.

54.     Pursuant to G.L. c. 21, § 42, any person who violates the Massachusetts Clean Waters Act or the CWA Regulations shall be subject to a civil penalty of up to $50,000 for each violation, with each day such violation occurs or continues constituting a separate violation.

55.     MassDEP is authorized to issue enforcement orders to direct compliance with the Clean Waters Act pursuant to G.L. c. 21 § 44 and 314 C.M.R. § 9.11. Failure to comply with an enforcement order is a violation of the Clean Waters Act. *Id.*, § 42.

56.     The Attorney General has authority to enforce the Clean Waters Act and the CWA Regulations pursuant to state law. *See* G.L. c. 12, §§ 3 and 11D.

## STATEMENT OF FACTS

### *Dynamic*

57.     Dynamic markets its services to landowners throughout the country, including landowners in Massachusetts. The company represents to potential customers that it has the expertise to responsibly design and construct solar array facilities on appropriate parcels, and that it will do so consistent with all required governmental permits and approvals. The company states on its web site that it controls "every step of the project ensuring exceptional quality, safety, and uncompromising cost control." Dynamic's web site features at least nine commercial, industrial, and real estate solar array projects that it has completed in Massachusetts.

### *Dynamic's Selection of a Hillside Upgradient of the*
### *West Branch Mill River for the Array*

58.     Sometime prior to September 2017, Dynamic entered into a lease with Hull Forestlands Limited Partnership ("Hull") to construct the Array on an 18.5-acre portion of Hull's 370-acre parcel in Williamsburg. The Array was to be located at 103 Briar Hill Road on a portion of what was then an active sand and gravel removal operation. Access to the Array is from a

private access road at 699 East Street, in the Town of Goshen (the "Access Road"). The Access

Road crosses both the West Branch Mill River and Rogers Brook.

59.     The site selected by Dynamic for this Array is a south-facing hillside that spans

approximately 1800 feet, at a slope of between 5% and 12%. The Site receives runoff from

approximately 25 acres of undeveloped land to the north. The West Branch Mill River runs near

the west and south side of the Array.

### *The West Branch Mill River, Its Tributaries,*
### *and Associated Resource Areas*

60.     The Mill River is a 13.5-mile-long tributary of the Connecticut River that originates

in Ashfield and runs through several towns before its confluence with the Connecticut River in

Northampton, Massachusetts. The river knits together a diverse landscape and offers numerous

recreational opportunities. The Mill River, the West Branch Mill River and its tributary Rogers

Brook, have been designated by the Commonwealth as "Coldwater Fish Resources." Coldwater

Fish Resources are particularly sensitive habitats used by reproducing coldwater fish to meet one

or more of their life history requirements.

61.     The West Branch Mill River and Rogers Brook in the vicinity of the Array are

within an area designated by the Commonwealth as "Core Habitat" critical for the long-term

persistence of a state listed "Species of Conservation Concern" known as the Northern Spring

Salamander. These waters have also been designated as "Aquatic Core Habitat" for the coldwater

fish species that inhabit them. Protection of Core Habitat "is essential to safeguard the diversity of

species and their habitats, intact ecosystems, and resilient natural landscapes across Massachusetts.

Less than three miles downstream of the Array lies designated habitat for a species of rare

dragonfly known as the Ocellated Darner. Dynamic's activities may be adversely impacting the Ocellated Darner's habitat.

62.     The Array is also close to several tributary streams and vegetated wetlands. The tributary streams and vegetated wetlands within the Mill River watershed are important in protecting aquatic resources by acting as a natural filtering system for water quality, for preventing downstream flooding, and by providing habitats to native species. The health and viability of these vegetated wetlands and tributaries significantly affects the health and integrity of the Mill River, the West Branch Mill River, and Rogers Brook.

***Dynamic's Representations to the Towns of
Williamsburg and Goshen about Sediment and
Erosion Control Planning at the Array***

63.     On September 7, 2017, Dynamic submitted to the Williamsburg Planning Board an application for a special permit to construct the Array. In the application, Dynamic represented that the Site was "relatively flat" and that the project would "not increase environmental pollution." The company stated that a sediment and erosion control plan would be implemented during construction to prevent sediment from leaving the Site or impacting environmentally sensitive areas, and that construction would be compliant with all applicable local, state and federal requirements. Dynamic assured the Town that the company would prepare a SWPPP and obtain permit coverage under EPA's Construction General Permit.

64.     On September 11, 2017, Dynamic sent the Williamsburg Planning Board a document entitled "Stormwater Review" in support of its application for a special permit. The Stormwater Review did not address runoff conditions *during* construction activities. It compared pre-construction with post-construction runoff conditions and stated that there would be no post-construction stormwater runoff from a 2-year or 10-year storm event, and "only modest" runoff

from a 100-year event. These predictions assumed that the soils at the Site would have "very high natural infiltration rates." The cover letter to the Stormwater Review noted that "[p]rior to construction of the solar array the remaining volume of saleable material will be removed by the current operator then the Site will be graded to a generally uniform slope from north to south." The Stormwater Review did not address the impact that removing this saleable material and re-grading the Site would have on the review's infiltration assumptions.

65.     On September 13, 2017, Dynamic submitted an RDA for the Array project to the Williamsburg Conservation Commission. The RDA stated that the soil on the Site was "Hinckley loamy sand, which is an excessively drained soil formed in an outwash plain." RDA, Section 2.0. The RDA did not inform the Conservation Commission that this material would be removed from the Site prior to installation of the Array, leaving only soil of slow infiltration capacity.

66.     Dynamic also attached inaccurate Plan Drawings to its RDA. The plans depicted the location of solar panels in an area considerably smaller and upgradient of the actual configuration. The solar panels ultimately extended more than 150 feet further downgradient and to the south of the area depicted in the Plans, thus making the Array closer to protected Resources, and reducing the area at the low point of the Site that would otherwise have been available to collect and treat stormwater runoff.

67.     The RDA further stated that the Array would not impact any wetlands or any other Resource Areas, and that the riverfront would be "completely avoided." Dynamic certified the RDA as complete and accurate to the best of its knowledge.

68.     On September 28, 2017, Dynamic's Director of Project Development, advocated for a special permit at a public hearing before the Williamsburg Planning Board and Zoning Board of Appeals. He stated that the gravel pit was an "excellent location" for ground-mounted solar

panels, that the Site contained the "best type of soil to avoid runoff" and that he expected they would not have to "cut one tree."

69.     On September 29, 2017, the Town of Williamsburg's Conservation Commission issued a Negative Determination concluding that the project did not require permitting under the Massachusetts Wetlands Protection Act based on Dynamic's presentation of the scope of the Array, and its representations that the Array would not alter any Resource Area.

70.     On October 2, 2017, Dynamic submitted an RDA to the Town of Goshen, Massachusetts Conservation Commission for its proposed installation of utility poles and wires along a portion of the Access Road located within Goshen. Dynamic stated in its submission that planned work near Resource Areas would not impact any Resource Areas. On October 29, 2017, the Town of Goshen Conservation Commission issued a Negative Determination, based on information submitted by Dynamic in its RDA, incorporating several conditions into the Determination, including the requirement that Dynamic establish appropriate erosion controls prior to construction.

71.     Notwithstanding its representations to the Towns of Williamsburg and Goshen, Dynamic never properly analyzed the potential for harm to nearby Resource Areas. It never considered or planned for erosion, sedimentation, and other pollutant discharges during construction. It failed to properly describe the scope of its project in the RDA and the nature of soils on the Site. It failed to install necessary stormwater controls before it conducted its Site clearing, grading, and other earth-disturbing activities at the Site. It ultimately expanded the scope of the project by approximately 5.2 additional acres that were not described in the RDA or approved by the Williamsburg Conservation Commission. Consequently, construction of the Array had dramatic adverse impacts on nearby protected Resource Areas.

18

## *Dynamic's Representations to EPA about*
## *Sediment and Erosion Control Planning at the Array*

72.     On August 3, 2018, Dynamic submitted a Notice of Intent to EPA requesting that its project at 103 Briar Hill Road be covered by the Permit. In its August 3, 2018 NOI, Dynamic certified to EPA that no Site work had commenced and that a SWPPP had already been prepared. On the same day, Dynamic received from EPA an automated notification that its coverage under the Permit would begin on August 17, 2018.

73.     Dynamic's NOI was not complete and accurate when submitted because the SWPPP had not yet been prepared. Dynamic's SWPPP is dated August 6, 2018, although Dynamic did not certify it until August 13, 2018. On August 13, 2018, Dynamic certified that the SWPPP and all of its attachments were, to the best of its knowledge and belief, "true, accurate, and complete."

## *Material Insufficiencies in Dynamic's SWPPP*

74.     Dynamic's SWPPP did not include the most essential foundational elements of a SWPPP.

75.     The SWPPP stated that "project plans, details, and other pertinent information" were included in its "Appendix E." Dynamic did not include such information, but rather, left Appendix E blank.

76.     The SWPPP did not identify the locations where earth-disturbing activities would occur or describe the phasing of earth-disturbing activities.

77.     The SWPPP did not set forth the approximate slopes before and after grading activities.

19

78.     The SWPPP did not identify the type and extent of pre-construction cover on the Site.

79.     The SWPPP did not set forth drainage patterns of stormwater before and after major grading activities.

80.     The SWPPP did not describe where sediment, soil, or other construction material would be stockpiled.

81.     The SWPPP did not set forth stormwater discharge locations.

82.     Other than to require 12-inch diameter perimeter control tubes at locations "specified on the project plans" (project plans were not included in the SWPPP), the SWPPP did not describe the locations of stormwater controls during construction.

83.     The SWPPP did not consider the expected amount, frequency, intensity, and duration of precipitation.

84.     The SWPPP did not consider the nature of stormwater runoff and run-on at the Site, including factors such as expected flow from impervious surfaces, slopes, and Site drainage features.

85.     The SWPPP did not consider the soil type and range of soil particle sizes expected to be present on the Site during construction.

86.     The SWPPP did not set forth stormwater controls designed and installed in accordance with good engineering practice.

87.     The SWPPP did not include the specific controls identified in Part 2.2 of the Permit to address the potential for stormwater pollution and sedimentation.

*Early Site Work and Erosional Conditions at the Array*

88.     Sometime during or before August 2018, the Site was stripped of most of the valuable and pervious gravel and sand deposits within the Site boundary. What remained for the most part was subsoil composed of glacial till.

89.     By August 13, 2018, a berm at the southern end of the Site, located between the West Branch Mill River and the Site, had breached, resulting in flow and "heavy erosion" of sand and sediment to the south.

90.     Sometime after August 13, 2018, Dynamic began to regrade the Site so that its surface sloped down more uniformly to the south towards the West Branch Mill River.

91.     The regrading exacerbated likelihood of catastrophic harm to the important downgradient Resource Areas.

92.     Following regrading, runoff was concentrated within the Array along the approximate centerline of the project and flowed south towards the West Branch Mill River.

*Dynamic's Failure to Comply with the Terms of the Construction General Permit*

93.     Dynamic did not put in place adequate stormwater controls based on the specific factors required by the Permit to be considered, as set forth in paragraphs 22-25, above.

94.     Dynamic did not use good engineering practice to design and install appropriate measures to control pollution, sedimentation, and erosion that runoff from the Site would cause.

95.     Dynamic did not properly maintain stormwater controls at the Site.

96.     Dynamic did not preserve the native topsoil, and it was not infeasible for Dynamic to have done so.

97.     Dynamic did not minimize soil compaction. Heavy machinery used by Dynamic during construction further compacted an already compromised and dense soil surface.

98.     Dynamic did not use erosion controls and velocity dissipation devices to minimize erosion of stormwater conveyance channels and their embankments, outlets, adjacent streambanks, slopes, and downstream waters.

99.     Dynamic did not properly design or maintain impoundments such as sediment basins.

100.     Dynamic did not promptly stabilize exposed portions of the Site.

101.     Dynamic did not control its discharges as necessary to meet applicable water quality standards. As a result, Dynamic caused the West Branch Mill River to exceed Massachusetts Water Quality Standards for "Solids" and "Color and Turbidity."

102.     Dynamic did not conduct regular site inspections as required by Part 4.0 of the Permit. The first inspection that it conducted was not until September 27, 2018, more than six weeks after it commenced site work. By that time, serious problems that could have been averted had already occurred.

103.     Even after it commenced occasional inspections, Dynamic did not comply with the Permit's inspection requirements. It did not inspect every seven days and within 24 hours of a storm event of 0.25 inches or greater.

### *Dynamic's Sediment Discharges from the Array*
### *to the West Branch Mill River, and its Associated Resource Areas*

104.     On October 3, 2018, Dynamic caused the soils on the Site to become saturated in several locations and to be transported downslope towards the southern end of the Site.

105.     On October 30, 2018, members of the Williamsburg Conservation Commission visited the Site. The berm on the southwest corner of the Site had held back too much water and failed catastrophically, causing large amounts of sediment to travel to the woods below. The

sediment flow had split into several channels, scoured intermittent streams, deposited sediment in a

Bordering Vegetated Wetland and River-front Area, and flowed into the West Branch Mill River.

106.    On November 6, 2018, MassDEP conducted a Site visit at the Array during a rain

event. Dynamic commenced construction without adequate stormwater controls, and as a result,

excessive, sediment-laden stormwater was pooling on the south end of the Site and flowing off the

property through a pipe to the south towards the Resource Areas, including the West Branch Mill

River. *See* Exhibits B through G.

107.    The remaining soils at the Site (after removal of marketable materials) consisted of

hardpan/till, with very low infiltration capacity. *See* Exhibit A. Dynamic had expanded the Site a

total of 5.6 acres beyond the scope of the Williamsburg Negative Determination and plans

submitted by Dynamic to the Williamsburg Conservation Commission. Dynamic filled

approximately 2.8 acres to the south of the authorized Array with solar panels, with an additional

2.8 acres of soil disturbance beyond that in order to create an impromptu stormwater basin. Exhibit

B.

108.    Dynamic did not take timely corrective action to address these Permit violations at

the Site. Impromptu measures taken by Dynamic after-the-fact were woefully inadequate to stem

the flow of sediment from the Site, and the resulting environmental impacts were devastating.

109.    Sediment-laden water discharged in large amounts from a pipe at the south end of

the Site eroded the hillside leading down to the River. *See* Exhibit C.

110.    Further down the hillside, the muddy stormwater scoured the land, picking up

additional sediments. *See* Exhibit D. As the flow hit streams, it scoured them out, uprooting trees

and destroying the streambeds. *See* Exhibit E. Deep layers of sediment from the Site, and sediment

picked up with the associated erosion, were deposited into downgradient Resource Areas. *See*

Exhibit F. Sediment-laden stormwater from the Site discharged to the West Branch Mill River, a Cold-Water Fish Resource, causing it to become brown and turbid. *See* Exhibit G.

111.     Dynamic has not restored the Resource Areas impacted by its unlawful activities. Among other things, deep layers of sediment from the Site, and sediment picked up with the associated erosion, remain in downgradient Resource Areas.

112.     During every significant rain event, sediment deposited into downgradient areas by Dynamic is remobilized and flows to Resource Areas, including the West Branch Mill River.

### *Dynamic's Sediment Discharges from the Access Road to the West Branch Mill River and its Associated Resource Areas*

113.     Dynamic's work along the Access Road also caused excessive erosion and sedimentation within Resource Areas, including in Riverfront Area associated with Rogers Brook and the West Branch Mill River, Bordering Vegetated Wetlands, and associated Buffer Zones.

114.     Dynamic did not install erosion controls according to plans approved by the Goshen Conservation Commission. Dynamic also failed to properly maintain its erosion controls. These failures resulted in continued deposition of sediments from the Access Road to Resource Areas associated with the West Branch Mill River and Rogers Brook.

115.     Specifically, as of November 2018, Dynamic's work on the Access Road caused sediment discharges to Land Under Waterbodies and Waterways associated with West Branch Mill River, Rogers Brook, and several jurisdictional tributary intermittent streams, as well as to bordering vegetated wetland associated with these waterways.

116.     As part of its work on the Access Road, Dynamic also clear-cut and filled an area a Water of the United States within the Commonwealth (a wetland) adjacent to Rogers Brook without approval from MassDEP.

### *Dynamic's Failure to Comply with MassDEP's Enforcement Order*

117.    On November 14, 2018, MassDEP issued a Unilateral Administrative Order ("MassDEP Order") concerning Dynamic's violations of the Massachusetts Wetlands Protection Act and Massachusetts Clean Waters Act.

118.    Consistent with the scope of MassDEP's authority, the MassDEP Order did not seek to address Dynamic's violations of the Permit.

119.    In the MassDEP Order, MassDEP ordered Dynamic to:

a.    immediately cease and desist all direct and indirect discharges to Resource Areas, Buffer Zones, and Waters of the United States within the Commonwealth;

b.    immediately undertake any and all practicable measures to provide short term stabilization of surficial soils, slopes, and stormwater at the Site;

c.    prepare and submit, within business 10 days, a Site Plan describing in sufficient detail the location of Resource Areas at and near the Site, and the impact to the Resource Areas from construction and runoff at the Site and Access Road; and

d.    prepare and submit, within 20 business days, a Long-term Project Site Stabilization and Stormwater Management Plan to properly manage stormwater at the Site.

120.    Dynamic did not immediately cease and desist all direct and indirect discharges to Resource Areas, Buffer Zones, and Waters of the United States within the Commonwealth.

121.    Dynamic did not immediately undertake any and all practicable measures to provide short term stabilization of surficial soils, slopes, and stormwater at the Site.

122.     The company did not timely and properly assess and document the environmental damage its discharges caused and did not timely submit an adequate long-term stabilization plan.

**FIRST CAUSE OF ACTION**
**Noncompliance with the Federal Stormwater Permit:**
**Violations of Section 301(a) of the Federal Clean Water Act; 33 U.S.C. § 1311(a)**

123.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

124.     The locations on the Site from which stormwater is discharged, including but not limited to the location of the pipe at the southwest side of the Site, are "point sources" within the meaning of Section 502(14) of the Act. 33 U.S.C. § 1362(14).

125.     The gulleys, channels, and fissures in the hillside and streambanks created by runoff from the Site are "point sources" within the meaning of Section 502(14) of the Clean Water Act. 33 U.S.C. § 1362(14).

126.     Sediment is a "pollutant" within the meaning of Section 502(6) of the Clean Water Act, 33 U.S.C. § 1362(6).

127.     Dynamic is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

128.     Dynamic is an "operator" of the Site, within the meaning of that term as set forth in the Permit, and is liable for the below violations by virtue of its role as "operator." As the operator of a construction project that disturbs one or more acre of land, and that discharges a pollutant from a point source to waters of the United States, Dynamic is required to obtain Permit coverage in connection with the Site. *See* Sections 301(a) and 402 of the Permit, 33 U.S.C. §§ 1311(a), 1342.

129.     The West Branch Mill River, its tributaries, and associated wetlands are "navigable waters," within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

130.    By failing to prepare a SWPPP consistent with Part 7 of the Permit before submitting its NOI, and by submitting an inaccurate NOI, Dynamic violated Part 1.4 of the Permit.

131.    By failing to prepare a SWPPP consistent with Part 7, and as set forth in paragraphs 73-86, above, Dynamic violated Part 7 of the Permit.

132.    By allowing site work, including but not limited to removal of topsoil and other surface materials from the Site, to commence before August 17, 2018 (14 days after NOI submittal date), Dynamic violated Part 1.4.3 of the Permit.

133.    By failing to consider the specific factors set forth in the Permit for the design of stormwater controls, as set forth in paragraphs 25 and 92, above, Dynamic violated Part 2.1.1 of the Permit.

134.    By failing to use good engineering practice to design and install appropriate measures to control pollution, sedimentation, and erosion at the Site, Dynamic violated Part 2.1.2 of the Permit.

135.    By failing to properly maintain stormwater controls, Dynamic violated Part 2.1.4 of the Permit.

136.    By failing to preserve the native topsoil unless infeasible, Dynamic violated Part 2.2.8 of the Permit.

137.    By failing to minimize soil compaction, Dynamic violated Part 2.2.9 of the Permit.

138.    By failing to implement the other controls as described in paragraphs 97-99, Dynamic violated Part 2.2 of the Permit.

139.    By failing to control its pollutants as necessary to meet applicable water quality standards, Dynamic violated Part 3.0 of the Permit.

140.    By failing to conduct regular site inspections, and by failing to otherwise meet the inspection requirements of the Permit, Dynamic violated Part 4.0 of the Permit.

141.    By failing to take timely corrective action to fix its violations and eliminate excessive stormwater pollution and sedimentation from the Site, Dynamic violated Part 5.0 of the Permit.

142.    These violations establish an ongoing pattern of failure to comply with the Permit's requirements.

143.    Each of Dynamic's violations of the requirements of the Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Section 505 (a)(1) and (f); 33 U.S.C. §§ 1365 (a)(1) and (f).

## SECOND CAUSE OF ACTION
### Violations of the Massachusetts Wetlands Protection Act and the Wetlands Regulations: G.L. c. 131, § 40; 310 C.M.R. § 10.00

144.    The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

145.    The Wetlands Protection Act and the Wetlands Regulations provide, with exceptions not relevant here, that no person shall remove, fill, dredge, or alter areas subject to that Act's protection, or cause, suffer, or allow such activity, without first filing a Notice of Intent with the appropriate local Conservation Commission and obtaining an Order of Conditions from the Conservation Commission or a Superseding or Final Order of Conditions from the Department permitting the activity. *See* G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a), 10.05(4)(a).

146.    Areas subject to the protection of the Wetlands Protection Act and the Wetlands Regulations include Bank (Inland)s, Bordering Vegetated Wetlands, Land Under Water Bodies

and Waterways, and Riverfront Areas. G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(1), 10.54(2), 10.55(2), 10.56(2), 10.58(2).

147.    The Wetlands Protection Act defines "person" to "include any individual, group of individuals, . . . partnership, . . . company, . . . or any other legal entity or its legal representative, agents or assigns." G.L. c. 131, § 40.

148.    Pursuant to 310 C.M.R. § 10.04, "alter" means "to change the condition of" any area subject to the protection of the Wetlands Protection Act, including, without limitation, "the changing of pre-existing drainage characteristics, . . . sedimentation patterns, flow patterns and flood retention areas," and "the destruction of vegetation."

149.    Dynamic is a "person" within the meaning of G.L. c. 131, § 40, and 310 C.M.R. §§ 10.00 *et seq*.

150.    The area of the West Branch Mill River to the south of the Site is bordered by "Bank (Inland)" as defined in the Wetlands Regulations. 310 C.M.R. §§ 10.04, 10.54(2).

151.    The land under the West Branch Mill River to the south of the Site is "Land Under Waterbodies and Waterways" as defined in the Wetlands Regulations. 310 C.M.R. §§ 10.04, 10.56(2).

152.    The area landward of the mean annual high water line of the West Branch Mill River outward 200 feet horizontally between the Site and the West Branch Mill River is "Riverfront Area," as defined in the Wetlands Regulations. 310 C.M.R. § 10.58(2).

153.    The vegetated wetlands to the south of the Site, between the Site and the West Branch Mill River are "Bordering Vegetated Wetlands," as defined in the Wetlands Regulations. 310 C.M.R.  § 10.55(2).

154.    The area of Rogers Brook that crosses the Access Road is bordered by "Bank (Inland)" as defined in the Wetlands Regulations. 310 C.M.R. §§ 10.04, 10.54(2).

155.    The land under Rogers Brook in the area that crosses the Access Road is "Land Under Waterbodies and Waterways" as defined in the Wetlands Regulations. 310 C.M.R. §§ 10.04, 10.56(2).

156.    The area landward of the mean annual high water line of Rogers Brook outward 200 feet horizontally in the area where the Access Road crosses Rogers Brook is "Riverfront Area," as defined in the Wetlands Regulations. 310 C.M.R. § 10.58(2).

157.    The area of the West Branch Mill River that crosses the Access Road is bordered by "Bank (Inland)" as defined in the Wetlands Regulations. 310 C.M.R. §§ 10.04, 10.54(2).

158.    The land under the West Branch Mill River in the area where the West Branch Mill River crosses the Access Road is "Land Under Waterbodies and Waterways" as defined in the Wetlands Regulations. 310 C.M.R. §§ 10.04, 10.56(2).

159.    The area landward of the mean annual high water line of the West Branch Mill River outward 200 feet horizontally in the area where the Access Road crosses the West Branch Mill River is "Riverfront Area," as defined in the Wetlands Regulations. 310 C.M.R. § 10.58(2).

160.    By discharging sediment laden stormwater to the Bank (Inland) area of the West Bank of the Mill River to the south of the Site, Dynamic has altered or filled an area subject to the protection of the Wetlands Protection Act.

161.    By discharging sediment laden stormwater to Land Under Waterbodies and Waterways under the West Branch Mill River to the south of the Site, Dynamic has altered or filled an area subject to the protection of the Wetlands Protection Act.

162.     By discharging sediment laden stormwater to Riverfront Area next to the West Branch Mill River to the south of the Site, Dynamic has altered or filled an area subject to the protection of the Wetlands Protection Act.

163.     By discharging sediment to Bordering Vegetated Wetlands to the south of the Site, between the Site and the West Branch Mill River, Dynamic has altered or filled an area subject to the protection of the Wetlands Protection Act.

164.     By discharging sediment to Bank (Inland) where the Access Road crosses Rogers Brook, Dynamic has altered or filled an area subject to the protection of the Wetlands Protection Act.

165.     By discharging sediment to Land Under Waterbodies and Waterways where the Access Road crosses Rogers Brook, Dynamic has altered or filled an area subject to the protection of the Wetlands Protection Act.

166.     By discharging sediment to Riverfront Area where the Access Road crosses Rogers Brook, Dynamic has altered or filled an area subject to the protection of the Wetlands Protection Act.

167.     By discharging sediment to Bank (Inland) where the Access Road crosses the West Branch Mill River, Dynamic has altered or filled an area subject to the protection of the Wetlands Protection Act.

168.     By discharging sediment to Land Under Waterbodies and Waterways where the Access Road crosses the West Branch Mill River, Dynamic has altered or filled an area subject to the protection of the Wetlands Protection Act.

169.    By discharging sediment to Riverfront Area where the Access Road crosses the West Branch Mill River, Dynamic has altered or filled an area subject to the protection of the Wetlands Protection Act. .

170.    By altering or filling these Resource Areas without an Order of Conditions from the Williamsburg and Goshen Conservation Commission, or a Superseding Order of Conditions from MassDEP, Dynamic violated the Wetlands Protection Act and the Wetlands Regulations. G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a), 10.05(4)(a), 10.08(1)(c).

171.    By allowing the unauthorized fill to remain in place in and on these Resource Areas, Dynamic violated and continues to violate G.L. c. 131, § 40 and 310 C.M.R. § 10.02(a).

172.    By altering or filling Resource Areas, Dynamic exceeded the scope of the Williamsburg Conservation Commission Negative Determination of Applicability, in violation of 310 C.M.R. § 10.08(1)(a).

173.    By altering or filling Resource Areas, Dynamic exceeded the scope of the Goshen Conservation Commission Negative Determination of Applicability, in violation of 310 C.M.R. § 10.08(1)(a).

174.    By expanding its construction activities to include an additional 5.2 acres beyond the area represented in its Plans, Dynamic exceeded the scope of the Williamsburg Conservation Commission Negative Determination of Applicability, in violation of 310 C.M.R. § 10.08(1)(a).

175.    By certifying to the completeness and accuracy of an RDA that was neither complete nor accurate, Dynamic violated 310 C.M.R. § 10.08(1)(d).

176.    By failing to comply with the MassDEP Order, Dynamic violated and continues to violate G.L. c. 131, § 40, and 310 C.M.R. § 10.08(1)(a).

177.     Each of Dynamic's violations of the Wetlands Protection Act and the Wetlands Regulations is a separate and distinct violation for each day on which the violation occurred and/or continued.

### THIRD CAUSE OF ACTION
### Violations of the Massachusetts Clean Waters Act:
### G.L. c. 21, § 43(2); 314 C.M.R. § 3.00 and § 9.00

178.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

179.     G.L. c. 21, § 26 and the CWA Regulations at 314 C.M.R. §§ 3.02 and 9.02 define "person" to mean, *inter alia*, any "public or private corporation or authority, individual, partnership or association, or other entity."

180.     The Massachusetts Clean Waters Act and the CWA Regulations at 314 C.M.R. § 3.03 provide, with exceptions not relevant here, that no person shall discharge pollutants into waters of the Commonwealth without a state issued pollutant discharge permit. *See* G.L. c. 21, § 43(2); 314 C.M.R. § 3.03.

181.     Dynamic is a "person" within the meaning of G.L. c. 21, § 26, and 314 C.M.R. §§ 3.02, 9.02.

182.     "Discharge" means "any addition of any pollutant or combination of pollutants to waters of the Commonwealth from any source …." 314 C.M.R. § 3.02.

183.     A "pollutant" is "any element or property of sewage, agricultural, industrial or commercial waste, runoff, leachate, heated effluent, or other matter, in whatever form and whether originating at a point or major non-point source, which is or may be discharged, drained or otherwise introduced into any sewerage system, treatment works or waters of the Commonwealth." *Id.*

184.     "Waters of the Commonwealth" means "all waters within the jurisdiction of the Commonwealth including, without limitation, rivers, streams, lakes, ponds . . . wetlands, coastal waters, and ground waters." *Id.*

185.     Sediment in runoff from the Array is a "pollutant" within the meaning of 314 C.M.R. § 3.02.

186.     The West Branch Mill River, Rogers Brook, and the other streams, impoundments, and wetlands into which sediment in runoff from the Array discharged are "Water[s] of the Commonwealth" within the meaning of 314 C.M.R. § 3.02.

187.     By discharging sediment in runoff from the Array to waters of the Commonwealth without a state issued pollutant discharge permit, Dynamic violated G.L. c. 26, § 43(2) and 314 C.M.R. § 3.03(1).

188.     By removing the permeable soils from the Array, erecting solar panels at the south end of the Site in an area not approved by the Williamsburg Conservation Commission or MassDEP, and failing to implement adequate stormwater pollutant and erosion controls at the Array and Access Road, Dynamic has engaged in activities that will reasonably result in the discharge of sediment to waters of the Commonwealth without a permit, in violation of G.L. c. 21, § 43(2) and 314 C.M.R. § 3.04(1).

189.     Dynamic's activities are not exempt under 314 C.M.R. § 3.05 for any of these violations.

190.     CWA Regulations prohibit the "discharge of dredged or fill material" to any Water of the United States within the Commonwealth without submission of a 401 Water Quality Certification Application ("Application") to MassDEP, subject to exceptions not applicable here. 314 C.M.R.   §§ 9.03, 9.04.

191.     "Discharge" of fill material means "any addition" of fill material. 314 C.M.R. § 9.02.

192.     "Waters of the United States within the Commonwealth" means "[n]avigable or interstate waters and their tributaries, adjacent wetlands, and other waters or wetlands within the borders of the Commonwealth where the use, degradation, or destruction could affect interstate or foreign commerce as determined by the Corps of Engineers. Bordering and isolated vegetated wetlands and land under water are waters of the United States within the Commonwealth when they meet … federal jurisdictional requirements …." 314 C.M.R. § 9.02.

193.     The West Branch Mill River, Rogers Brook, and the other streams, impoundments and wetlands into which sediment from the Array discharged are "Waters of the United States within the Commonwealth" within the meaning of 314 C.M.R. § 9.02.

194.     The wetland adjacent to the Access Road that was filled by Dynamic during construction of the Access Road is a "Water of the United States within the Commonwealth" within the meaning of 314 C.M.R. § 9.02.

195.     By discharging sediment from the Array and by discharging sediment picked up in runoff from the Array into the West Branch Mill River, Rogers Brook and other streams, impoundments and wetlands downgradient of the Site, Dynamic placed "fill material" to Waters of the United States within the Commonwealth within the meaning of 314 C.M.R. § 9.00. *See also* 314 C.M.R. § 9.06(6)(regulating stormwater discharges and prohibiting any new stormwater discharges that cause erosion in wetlands or waters of the Commonwealth).

196.     By filling a wetland adjacent to the Access Road during construction of the Access Road, Dynamic placed "fill material" to Waters of the United States within the Commonwealth within the meaning of 314 C.M.R. § 9.00.

35

197.    By discharging fill material to Waters of the United States within the Commonwealth without first submitting an Application to MassDEP, Dynamic violated G.L. c. 26, § 43(2) and 314 C.M.R. § 9.04.

198.    Dynamic's activities are not among those listed in 314 C.M.R. § 9.03 as not requiring an Application.

199.    Each of Dynamic's violations of the Clean Waters Act and the CWA Regulations is a separate and distinct violation for each day on which the violation occurred and/or continued.

## RELIEF REQUESTED

Wherefore, the Commonwealth respectfully requests that this Court grant the following relief:

1.    Enjoin Dynamic from discharging sediment to Waters of the United States or Waters of the Commonwealth;

2.    Require Dynamic to implement the requirements of the Permit;

3.    Order Dynamic to pay civil penalties of up to:

    a.    $54,833 per day of violation of the Federal Clean Water Act, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 84 Fed. Reg. 2056 (Feb. 6, 2019).

    b.    $25,000 for each day of each violation of the Wetlands Protection Act, G.L. c. 131, § 40, to the Commonwealth; and

    c.    $50,000 for each day of each violation of the Clean Waters Act, G.L. c. 21, §§ 26-53, to the Commonwealth.

4.    Order Dynamic to take appropriate actions to restore the quality of protected Resource Areas and waterways impaired by its activities;

5.      Award the Commonwealth's costs (including reasonable investigative, attorney,

witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

6.      Award any such other and further relief as this Court may deem appropriate.


April 28, 2020

                                        Respectfully submitted,

                                        COMMONWEALTH OF MASSACHUSETTS

                                        By its attorneys,

                                        MAURA HEALEY
                                        ATTORNEY GENERAL

                                        */s/ Nora J. Chorover*
                                        _____
                                        Nora J. Chorover (Bar No. 547352)
                                        Special Assistant Attorney General
                                        Environmental Protection Division
                                        Office of the Attorney General
                                        One Ashburton Place, 18th Floor
                                        Boston, Massachusetts 02108
                                        Tel: (617) 963-2642
                                        Nora.Chorover@mass.gov